UNITED STATES of America,
Appellee,

v.

David J. LEWIS, Appellant.

No. 74, Docket 34626.

United States Court of Appeals,
Second Circuit.

Argued Sept. 15, 1970.

Decided Aug. 13, 1971.

Gary P. Naftalis, Asst. U. S. Atty., New York City (Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., and William B. Gray, Asst. U. S. Atty, New York City, on the brief), for appellee.

Jerome J. Londin, New York City (Carro, Spanbock & Londin, and Allen Green, New York City, of counsel), for appellant.

Before WATERMAN, MOORE and KAUFMAN, Circuit Judges.

MOORE, Circuit Judge:

Appellant, David J. Lewis, appeals from a judgment of conviction, entered after a jury trial, on both counts of the indictment against him. Count 1 charged Lewis with giving an Inspector of the Internal Revenue Service (IRS) $200 to induce him to furnish information from confidential files of the IRS in violation of Section 201(b) of Title 18, United States Code. Count 2 was based on the same facts but charged that the $200 was given for official acts being performed by the Investigator, namely, the investigation of misconduct and corruption on the part of IRS employees, in violation of subparagraph (f) of Section 201.

On motion the Court dismissed Count 2 as a lesser offense included in Count

1. Our review is thus limited to the alleged errors during the trial which may have affected the conviction on Count 1. Count 1 alleges that the $200 payment was to induce a public official (the official was Harold Wenig [Wenig], an undercover agent of the IRS and an Inspector in the office of the Regional Inspector) "to do an act in violation of his lawful duty, to wit, to furnish information from the offices and confidential files of the Inspection Service, Office of the Regional Inspector, 50 Church Street, New York, N. Y." The indictment must be read on the assumption that it was Wenig's lawful duty not to furnish information and that Lewis' alleged bribe was to cause Wenig to fail to comply with this duty. If there be a crime, it must be found under Section 201(b) (3), namely, inducement of an act "in violation of his lawful duty"—in short, Wenig was not supposed to disclose anything in the confidential files, or in other words disclosure was unlawful.

Lewis argues that he was entrapped as a matter of law and that the Trial Court (1) erroneously excluded evidence that the impetus for his alleged payment of money to Wenig came from the Government and (2) erroneously admitted into evidence testimony bearing no relationship to the charges against him. We reverse and remand for a new trial.

These claimed errors are best discussed as the facts are developed in chronological order. The defense of entrapment and governmental impetus thereunder depend upon the circumstances under which Lewis and Wenig first met on April 3, 1967, when the $200 is alleged to have been passed. It is undisputed that Lewis had never met Wenig until another IRS agent, Louis Behar (a mutual friend who has pleaded guilty to making illegal payments to Wenig), brought Lewis to Wenig's automobile on April 3. To Lewis' entrapment defense, these circumstances were highly significant and probative. The Government apparently was desirous of having the Wenig-Behar and Wenig-Lewis conversations tape-recorded. Certain of these recorded conversations were admitted at trial; others were excluded. The first recording was of a conversation on March 27, 1967, between Wenig and Behar. Lewis was not present, but he claims that this conversation shows how he was brought into the picture, hence, the relevance of this tape to his entrapment defense. Its exclusion, he asserts, was highly prejudicial.

*Exclusion of the March 27, 1967 Conversation*

"Without Wenig the Government had no case"; [1] by the same token, without Wenig, Lewis had no case on the "inducement" aspect of his entrapment defense.[2] The key to that defense lay in a portion of the recorded conversation which occurred on March 27, 1967, between Wenig and Behar. Through an offer of proof (the transcript of the conversation) and the introduction of testimony through Wenig relating to that portion of the conversation referring to Lewis, the defense hoped "to establish entrapment by showing that the impetus for the [April 3, 1967 Wenig-Lewis] meeting came from Wenig and not Lewis." [3] The pertinent portion of the trial transcript dealing with the conversation, which is reproduced in the margin [4] is summarized below.

---

1. Appellant's Br. at 17.

2. The Government suggests that Behar should have been called by the defense, citing United States v. Manfredonia, 414 F.2d 760, 765 (2d Cir. 1969). Though we find no dispositive hearsay problem, to which *Manfredonia* speaks, we note that to have called Behar as a defense witness would have entailed considerable risks which in all likelihood outweighed any possible benefits. Behar was an IRS agent who had been compromised by, indicted for, and had pleaded guilty to making illegal payments to Wenig, and therefore could hardly have been expected to give favorable and creditable testimony for the defense.

3. Trial Transcript (Tr.) at 165.

4. *Wenig—Direct (By Mr. Naftalis)*
 Q. At this meeting with Mr. Behar, did you have any conversation regarding David Lewis? A. Yes, I did.
 Q. Can you tell the jury what you recall of your conversation with Lewis

The prosecutor appears to have endeavored to anticipate the defense on the issue of "inducement" by opening up the matter of the conversation through Wenig on direct examination. In the face of a sustained general objection to a question defective in form only ("Can you tell the jury what you recall of your conversation with Lewis [sic] Behar regarding David Lewis on that date?"), the prosecutor dropped the subject. On cross-examination, the subject was sought to be reopened when Wenig was asked whether he had asked Behar "to have Lewis communicate with you." [5] An objection was raised and sustained on the ground of hearsay. When Wenig was next asked whose initial idea and suggestion it was that Wenig meet Lewis, the prosecutor again objected and was sustained on the grounds of hearsay and exceeding the scope of the direct exam-

[sic] Behar regarding David Lewis on that date?

Mr. Londin: Objection.

The Court: Sustained.

\* \* \* \* \*

*Wenig—Cross-Examination (by Mr. Londin)*

Q. Did you ask Agent Behar to have Lewis communicate with you?

Mr. Naftalis: I am going to object to that. That is the same material that was objected to, when I tried to bring it out on direct examination, by Mr. Londin.

The Court: You are objecting to it as hearsay?

Mr. Naftalis: Yes, I am, your Honor.

The Court: Sustained.

*By Mr. Londin:*

Q. Whose suggestion was it that you meet with Mr. Lewis, suggestion in the first instance? Whose initial idea was it?

Mr. Naftalis: Objection; hearsay.

The Court: On what ground?

Mr. Naftalis: It is hearsay. It is also beyond the scope of the direct. This was a matter I was not permitted to go into on direct examination by Mr. Londin's objection.

The Court: I will sustain it as hearsay.

\* \* \* \* \*

Mr. Londin (At the side bar): I believe, your Honor, that if permitted to testify, Mr. Wenig would say that he asked Behar to arrange a meeting between him and Lewis. I want to establish for purposes of the entrapment defense that the impetus to the meeting came from Wenig and not Lewis. That is all I want to do.

The Court: Do you object to that?

Mr. Naftalis: Yes, I do, your Honor. I tried to get into prior conversations between Behar and Lewis—between Behar and Wenig on direct examination. Mr. Londin objected and the objection is sustained. Now he is trying to bring out the same material.

\* \* \* \* \*

The Court: I will sustain the objection, but if you on redirect wish to bring it out, you may do so, in which event he can then cover the ground.

I think that you are limited at this stage to the direct, particularly when you foreclosed this line of inquiry by your objection.

You can't have it both ways. You can't rule out the part you don't like and then try to get in the part you do. It is hearsay, obviously. It is a question now whether you both want this hearsay and if you both do then I will allow the government to elicit it as the government sought to do at the outset.

Mr. Londin: I don't know what the government proposes to ask and that's why I objected.

I think my offer is a very narrow one on a very narrow issue.

The Court: Yes, but you can't have Wenig portrayed here as asking for an interview without getting the background, and if you get the background the chances are that you then have Behar's story being told through Wenig's mouth, I guess. I don't know \* \* \* \* \* \* \* \* \*

All I know is once you go into hearsay, you want to open the door, that is all right, you can do it if it is relevant to the issues on trial and both sides don't object.

Mr. Londin: I would like to ask him whether he, in fact, didn't ask Behar to get Lewis.

The Court: No. That is objected to.

Mr. Londin: Where the U. S. Attorney goes from there is up to him.

The Court: No. I think I will do it this way.

I will let him go into the background of that request on his redirect, unless you object to it. Then you may ask the question.

Tr. 14–15, 164–168.

5. Tr. 164.

ination, despite the defense's strenuous argument that its line of questioning was for a narrowly limited, important and proper purpose.

During the continued cross-examination of Wenig following this initial colloquy at the side bar, defense counsel twice sought to elicit testimony or introduce other evidence regarding Behar's role in allegedly procuring Lewis for contact with Wenig. Each time the court sustained the Government's objection "for the reasons indicated at the side bar." On the second attempt, defense counsel asked the court "to have marked as a court exhibit the transcript of the Behar-Wenig meeting of March 27, 1967, so that the record will be complete." The court stated, "I don't see any necessity for marking it." At the end of trial, in support of his motion to set aside the jury's verdict, defense counsel handed up a 35-page copy of the transcript referred to, in order to demonstrate that counsel's earlier offer of proof regarding the conversation—*i. e.*, that "if Mr. Wenig were asked what he said to Mr. Behar about Mr. Lewis, Mr. Wenig would have testified that he asked Mr. Behar to bring Mr. Lewis. * * * "—was accurate and had "substance to it." The Court had the transcript marked as "Court Exhibit 1 on motion for a new trial," but denied the motion on the ground that "the conversations between Wenig and Behar were at best peripheral and not sufficiently material." [6]

The transcript reveals the following. Wenig showed Behar a list of names and asked him, "[D]o you know any of these names here?" The first name on the list was that of Lewis. Behar responded, "David Lewis is the only one I think I know." Behar then asked, "On Dave Lewis, you want me to talk to him?" Wenig answered, "If you know him?" When Behar said he would talk to his group chief, a Mr. Block, about Lewis, Behar added, "I don't know Lewis to talk

to." Wenig, undaunted, responded, "Oh but Block knows Lewis." Behar concluded with, "Well, maybe I can find somebody else that knows, maybe Moe Wacks knows."

■■ It would thus appear that the web was woven on March 27, and that Lewis was brought by Behar to Wenig on April 3 at Wenig's instance, contrary to the prosecution's theory and Wenig's testimony that it was Lewis who initiated contact with Wenig through Behar. Given Lewis' defense of entrapment, it is difficult to conceive how a defense attempt to elicit testimony tending to show Government impetus for the commission of the alleged crime can be regarded as "peripheral."

In Lopez v. United States,[7] the Supreme Court stated,

"The conduct with which the defense of entrapment is concerned is the *manufacturing* of crime by law enforcement officials and their agents. * * Thus before the issue of entrapment can fairly be said to have been presented in a criminal prosecution there must have been at least some showing of the kind of conduct by government agents which may well have induced the accused to commit the crime." (Emphasis in the original.)

In United States v. Morrison,[8] a panel of this court expanded on the nature and thus the conduct of the entrapment defense:

"We take this opportunity to restate what was implicit in our former decision [United States v. Pugliese, 346 F.2d 861 (2 Cir. 1965)]: assuming that the government has initiated or set in motion the acts of the defendant, the entrapment defense probes not only the predisposition of the defendant to commit the crime with which he is charged, but alternatively, the conduct of the government in promoting the commission of the crime."

---

6. *See* Tr. 676–678.

7. 373 U.S. 427, 434–435, 83 S.Ct. 1381, 1385, 10 L.Ed.2d 462 (1963).

8. 348 F.2d 1003, 1004 (2d Cir.), cert. denied, 382 U.S. 905, 86 S.Ct. 242, 15 L.Ed. 2d 158 (1965).

Moreover, with respect to the question whether Behar, as Wenig's agent, induced Lewis to commit the crimes, the defense had the burden of proof.[9] That burden consisted merely of showing "the Government's initiation of the crime and not * * * degree of pressure exerted."[10] Lewis was improperly denied a critical opportunity to meet this burden by the Trial Court's refusal to permit cross-examination of Wenig with respect to the conversation regarding Lewis, and the jury was thereby precluded from considering the impact of alleged Government instigation as well as Lewis' alleged predisposition to commit the crime charged. This clearly was far from "harmless error."

The Government argues that both of the Trial Court's stated reasons for preventing defense counsel from cross-examining with respect to the conversation, as it bore on who initiated contact as between Wenig and Lewis, were correct. These grounds were that the line of questioning went beyond the scope of the Government's direct examination and that in any event Wenig's testimony would be inadmissible hearsay.

 This court's rule with respect to the scope of cross-examination continues to be that it is limited to the "subject matter of the examination in chief,"[11] or in more modern parlance to "the limited scope of the direct examination."[12] While enforcement of this rule generally is within the trial court's discretion,[13] in a close case the rule must not be so strictly applied as to deprive the defense of an opportunity to present to the jury a vital element of the defense, here Government "inducement," an element of the entrapment defense on which the accused has the burden of proof.

Our inquiry is directed to whether the matter of the conversation was sufficiently opened up by the Government on Wenig's direct examination to entitle the defense to probe into whether it was Wenig rather than Lewis who provided the impetus for the fateful April 3 meeting. Just before the prosecutor asked the excluded question directing Wenig generally to recall the conversation, the following question was posed, "At this [March 27] meeting with Mr. Behar, did you have any conversation regarding David Lewis?" Wenig replied, "Yes, I did." The excluded question was then asked, objected to generally and sustained without comment by counsel or the Court. Questions regarding the subject matter of the pertinent part of the conversation were not picked up again until cross-examination of Wenig, when defense counsel asked, "Did you ask Agent Behar to have Lewis communicate with you?" The prosecutor objected, on the ground "[t]hat this is the same material that was objected to, when I tried to bring it out on direct examination, by Mr. Londin." The objection was sustained under the hearsay rule.

 Under any generally accepted theory or definition of "scope,"[14] there is no doubt that the subject matter of the conversation was sufficiently opened up for searching inquiry on cross-examination.[15] The purpose of the question

9. United States v. Sherman, 200 F.2d 880, 882–883 (2d Cir. 1952) (L. Hand, C. J.).

10. United States v. Riley, 363 F.2d 955, 958 (2d Cir. 1966); United States v. Jones, 360 F.2d 92, 96 (2d Cir. 1966); United States v. Pugliese, 346 F.2d 861, 863 (2d Cir. 1965).

11. United States v. Minuse, 142 F.2d 388, 389 (2d Cir.), cert. denied, 323 U.S. 716, 65 S.Ct. 43, 89 L.Ed. 576 (1944).

12. United States v. Dardi, 330 F.2d 316, 333 (2d Cir. 1964), cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1965).

13. United States v. Minuse, 142 F.2d 388, 389 (2d Cir.), cert. denied, 323 U.S. 716, 65 S.Ct. 43, 89 L.Ed. 576 (1944).

14. See McCormick on Evidence § 21, at 43–44 (1954).

15. We therefore conclude that the court's "suggestion," at Tr. 166, 168, that the matter could be picked up by the Government on re-direct and then followed up on recross-examination was improvidently made. As reasonably expected, the Government wisely declined the Court's invitation, and which under the Court's

clearly was to lay the foundation for further questioning of Wenig on direct regarding the subject matter of that portion of the conversation. Rather than formulate a more narrowly framed question not violative of the hearsay rule, not a burdensome curative measure, the prosecution ceased to pursue that line of questioning and took up the matter of a March 30, 1967 telephone conversation with Behar (the contents of which also were not explored on direct), which provided the logical transition into the matter of the April 3 meeting, initially comprised of Wenig, Lewis and Behar. Thus, absent cross-examination as to the conversation, the jury was left by the prosecution with a strong and unrebutted inference that it was Lewis through corrupt middleman Behar, rather than Wenig through Behar, who arranged the April 3 meeting.

Wigmore points out that

"[u]nder the *Federal rule*, it is clear that nothing prohibits cross-examination to one's own case where the calling party has been allowed (ante § 1883) in his direct examination to bring out facts in rebuttal of a prospective defense * * * *"[16] (emphasis in the original: footnotes omitted).

That is exactly what happened below. For reasons unexplained, the prosecutor decided to ask Wenig on direct examination about the conversation specifically as it related to Lewis. Obviously the prosecutorial purpose in raising this special aspect of the conversation was to anticipate or preempt the defense's entrapment case by attempting to show on direct that there was no possible Gov-

ernment instigation of the alleged criminal events of April 3. That the prosecutor failed on direct to continue upon its charted course once it hit choppy seas could not prevent the defense from taking the wheel on cross-examination. The prohibition of cross-examination unfairly deprived the defense of the opportunity for far-ranging cross-examination of Wenig on the subject of the conversation and left the jury with an impression clearly unfavorable to Lewis, based on highly fragmentary circumstantial evidence.[17]

The chief, if not sole, virtue advanced on behalf of the restrictive "Federal rule" is that it ensures that the customary order for the introduction of proof is preserved by preventing the cross-examiner from eliciting evidence for its affirmative case. Surely that rationale, laboring under long-levied criticism by eminent authorities,[18] is thoroughly subverted where it is applied even though the prosecution on direct is permitted to open the door to a matter bearing directly upon the defense's case in chief.

■ With respect to the hearsay argument, the Government contends (1) that none of Behar's March 27 statements were admissible because of their hearsay nature and (2) that several of Wenig's statements on the occasion of the conversation were likewise inadmissible hearsay because they "contain hearsay declarations previously made by Behar, the out-of-court declarant." Returning to the record: defense counsel asked Wenig, "Did you ask Agent Behar to have Lewis communicate with you?" The prosecutor objected and was sustained by the court on the ground of hearsay. It

---

ruling thereby would have precluded the defense from taking advantage of the benefits of cross-examination of a clearly unfriendly witness.

16. 6 Wigmore on Evidence § 1891, at 561 (3d ed. 1940).

17. Under present tactical rules of evidence, the prosecution could have denied the defense the opportunity of cross-examining Wenig on the matter of the conversation simply by never raising it in the first in-

stance, thereby forcing the defense to make the choice whether to make Wenig its own witness. *See* McCormick on Evidence § 23, at 46 (1954).

18. *See* 6 Wigmore on Evidence §§ 1887–1888 (3d ed. 1940); McCormick on Evidence § 27 at 50–52 (1954); *see also* Rule 611(b) and Advisory Committee Notes thereon of the Revised Draft of the Proposed (Federal) Rules of Evidence, in 51 F.R.D. 315 (1971), which abolishes the restrictive Federal rule.

is clear that no hearsay answer was called for; Wenig was a sworn witness testifying in court, subject to cross-examination (here via re-direct), who was asked to answer a question posed for the narrow but highly important purpose "of the entrapment defense [whether] the impetus to the meeting came from Wenig [the witness] and not Lewis." No out-of-court statement of any stripe by an unsworn out-of-court declarant, offered for the truth of the assertion, was called for, directly or indirectly, by the question, and it should therefore have been allowed.[19] Whether "Wenig's request for the [April 3] interview was just one little pebble on the beach of this whole matter and [whether] there had been a great deal that went on before that indicated that Lewis was the initiator," [20] would have been a proper subject for Government coverage on re-direct—not a basis for exclusion on hearsay grounds, as the Trial Court ruled. Returning to the transcript: Wenig asked Behar whether he recognized any of the names on a list shown to Behar on which Lewis' name was the first. A question put to Wenig whether he had shown such a list to Behar and asked him, "[D]o you know any of these names here?" clearly would have been proper under the hearsay rule.[21] After a brief conversational interlude, Wenig returned to the matter of the names on the list:

> Wenig: " * * * So this is-a-The other fellows you don't know, Fennell, Kosyn.
>
> Behar: "David Lewis is an old timer there, Group Chief I used to have, Group Chief he's no longer there.
> * * * * * *
> "I don't know them at all. David Lewis is the only one I think I know."

■ Later on, when Behar asked, "On David Lewis, you want me to talk to him?", Wenig replied, "If you know

him?" Neither of these sentences fall into the inadmissible hearsay category because the sentences clearly had no assertive or testimonial import—*i. e.*, their truth or falsity was irrelevant; the respective utterances went solely to the declarants' states of mind vis-a-vis the initial establishment of contact of Wenig with Lewis through Behar to induce the commission of the crimes charged. This latter rationale, constituting an exception to the hearsay rule,[22] is likewise applicable to Behar's cautionary remark, "I don't know Lewis to talk to," and Wenig's immediate follow-up, of "Oh but Block knows Lewis." The truth or falsity of the respective declarants' statements that Behar didn't know Lewis "to talk to" or "Block knows Lewis" was irrelevant. The statements were relevant "impliedly, indirectly or inferentially [to] indicate the existence of the mental or emotional state that they are tendered to prove [here, Wenig's persistence in attempting to establish contact with Lewis, as evidenced by his coming up with a suggested alternative means of communication with Lewis when Behar indicated that he knew of none]," which in turn became relevant as circumstantial evidence of other facts [23] (here "to inform the jury that the subsequent meeting and payment was induced by Wenig's instructions to Behar, not by Lewis' instructions to Behar.").[24]

The court's exclusion of defense counsel's question and the closing off of any questioning of Wenig with respect to the conversation deprived the jury of important evidence necessary in considering whether the defense had sustained its burden of proof on the issue of Government "inducement" as part of the entrapment defense and in our opinion was highly prejudicial to Lewis. The erroneous evidentiary ruling below effectively cut off a vital aspect of Lewis'

19. Cf. United States v. Elgisser, 334 F.2d 103, 108 (2d Cir. 1964).

20. Tr. 167.

21. See 6 Wigmore on Evidence § 1788, at 234, § 1790, at 237–238 (3d ed. 1940).

22. See McCormick on Evidence § 228, at 465 (1954).

23. Id.

24. Appellant's Br. at 19.

defense and his cause was seriously prejudiced thereby as a matter of law.

### The Wenig-Lewis Meeting of April 3, 1967

Lewis had been an IRS employee auditing taxpayers' returns for some 21 years. Wenig, using frequently the alias or code name of "Springer," was assigned the task of ferreting out IRS employees suspected of taking bribes. In pursuit of this assignment Wenig arranged to meet Lewis, whom he had never spoken with or met. The meeting was brought about as previously outlined and took place in Manhattan on April 3, 1967. Behar brought Lewis to the meeting place and introduced him to Wenig. Shortly thereafter Behar departed, leaving Lewis and Wenig alone in Wenig's car.

Wenig's car, and Wenig himself, were well equipped with modern electronic transmitting and recording devices. Secreted behind the glove compartment was a microphone attached to a wire which ran into the trunk of the car where a Butoba tape recorder was located. Wenig carried, concealed on his person, a radio transmitter and a wire recorder with microphone attachment. Other IRS agents photographed the meeting from another car. Therefore, whatever occurred between Wenig and Lewis on that day should be as well perpetuated by sight and sound as modern electronic science permits.

Wenig opened the conversation by telling Lewis that he had information that concerned Lewis and dropped the names of a "few of the boys" who could vouch for what he (Wenig) had done. He threw out bait for other names that he would be willing to see but because it was risky he, Wenig, had "to make a piece of bread." On the basis of some papers that "I Xeroxed from the file," Wenig disclosed to Lewis that two reliable informants knew about Lewis' "manipulations with stocks," particularly about his "trading in new issues" in 1961 (some six years earlier) and his "kickbacks of [70% of] the profits to the brokers," while "at the same time you [Lewis] legitimized some of your money that you couldn't show." Wenig further volunteered that "they" "also have good information that you recommend accountants to certain people which is a violation of the rule," that "they have your tax returns," and that "[t]hey are also interested in the fact that they might be able to get you on the speculation angle where it says an [IRS] employee is not to speculate, Dave." Wenig added that "they have a lot of information that's very detailed," including "some information that the money was accumulated through a series of bribes that you accepted." Wenig increased Lewis' uneasiness by telling him, "Oh yeah you'll probably be called in" and concluded his presentation of "facts" with the following flourish, "They got a lot of stuff, there's a lot of stuff in that file, and [although] I haven't read * * 90% of it, * * * it's dynamite." Very shortly after this point came the following conversation:

"Lewis: Take this down here.

Wenig: All right—ah—O.K., good.

Lewis: Uh—little envelope for you.

Wenig: Oh, oh, O.K. good, fine, fine. Thank you.

Lewis: Uh—Harold, uh—many many years I've been working on these publicly listed corporations. So—ah

Wenig: Oh, by the way, what is it, 200 here? Did you give me two? Oh, fine, very good.

Lewis: So—uh—you know I've * * * "

### The Wenig-Lewis Telephone Conversation of August 18, 1967.

On August 18, 1967 Wenig initiated one of several telephone calls to Lewis during which he said that "there has been activity" on Lewis' case; that it had been re-assigned to "a very confidential friend of mine," "a buddy I pal around with." Wenig gratuitously offered to be an "intermediary" and once again raised the subject of "a little ah schmear * * * you know we discuss-

ed that * * *" so that his golf "buddy" should "hear some sort of figure" in order to determine what tack to take. Lewis initially was disinterested, when Wenig raised the spectre of his friend's bringing the alleged Lewis investigation "to a conclusion that's uh unfavorable." "Well, I'm not concerned about that, ah, Harold"; "Well, well you know you have to trust in God too, Harold"; "* * * I mean nothing's guaranteed in this life * * *" Unsuccessful thus far in getting Lewis to offer money or a specific amount, Wenig began to apply pressure:

"The thing is this, what do you want me to do? Do you want me to ah, ah, drop a word to him, do you want me to, huh?

* &ast; &ast; &ast; &ast; &ast;

"If this guy ah could, ah, hear some sort of figure maybe, or something, after all there's not going to be more than one guy in on this. He might, ah, he might then know what tack to take in completing the case."

When Wenig asked Lewis what would happen if Wenig's friend would not "feel your interest," Lewis responded: "Well, that's a chance I will have to take Harold, because uh frankly, I am not concerned about it as I say ah, nobody can be above God." Because Lewis still did not indicate that he wanted anything to be done, Wenig asked him, "What's the sense of pulling punches," and added, "[Y]ou want to live in a false sense of security, * * * that's up to you. But ah it's ah best ah to know ah the truth even if it's pessimistic. Right?" Lewis answered, "[L]et me put it this way Harold. I haven't done anything wrong so I'm not concerned." Lewis was worried, however, because "in the last few years I [have] seen several fellows who haven't done anything wrong who have been discredited"; moreover, since, as Wenig reminded him, Lewis had only two years of IRS service remaining before retirement, although "there's no truth to the thing," "I can't take the aggravation." This conversation was summarized by each party's conclusion:

Lewis, "It's better to say nothing at all to him"; Wenig, "[Y]ou didn't give me any leeway ah, or any ah specific ah ah, figures or anything so I got to ah just ah," to which Lewis interrupted, "Look Harold, I think this thing will be forced to a close on its merits. Let me say that."

*The Prosecution's Opening Statement*

■ In his opening statement to the jury, the prosecutor characterized the function of the IRS Inspection Service in the following manner: "They investigate allegations of bribery, corruption and other misconduct by Internal Revenue agents such as Mr. Lewis—" This sentence, the meaning of which is at best ambiguous, must have left a distinct impression in the jurors' minds that Lewis was guilty of "bribery, corruption, or other misconduct." Near the conclusion of his remarks, the prosecutor stated that "[t]he Government will also prove that the facts of the Inspection Service investigation of Lewis were true," which in the prosecutor's own words earlier included "illegally obtained bribe money."

Thus at the outset the jury must have obtained the impression that Lewis had accepted bribes from taxpayers. There was no proof whatsoever of this assertion. The prosecution, however, was permitted to introduce proof that Lewis had in the past purchased various stocks which the prosecutor characterized as speculations. Again without any proof even to support an inference, the Government proceeded on the theory that Lewis' stock transactions were to "legitimize" his bribe moneys.

*Lewis' Stock Transactions*

After Lewis entered Wenig's car and Behar left, Wenig immediately pursued his assigned task. He produced two cards from which he read information purportedly contained thereon, namely, "that the inspection service had two informants that were giving information regarding David Lewis and his manipulations in the stock market and his deals with legitimizing certain monies that he

had." Wenig told Lewis that the Inspection Service knew that in 1961 Lewis was speculating in new issues and was "kicking back" to brokers seventy percent of his profits. This was not "new" information to Lewis.

At this point the prosecutor asked Wenig, "What does that term [legitimizing money to Mr. Lewis] mean?" Whereupon, although saying that, "This is just to illustrate, this is not evidence that that was the fact in this case," the Court, over objection, permitted the following answer:

"As I was saying, where one has large sums of illicit money or illegally gotten money, money that may have been stolen or accumulated through a series of bribes and this person is afraid to spend this money openly because he is afraid that the Internal Revenue Service may audit him some day and then they may question that the money was illicitly gotten, so this person uses a device or mechanism or a scheme whereby he makes this money appear legitimately, appear legitimate so that he could spend it without fear of investigation.

"For example, if a gentleman had large sums of money that he couldn't show, bribe money, and he had a business on the side and he then would declare large nonexistent profits coming from this business, or what he may do, he may work with a stockbroker and have this stockbroker give him new issues of stock which would be bound to make money, bound to go up in value and then when he sells this stock at a good profit give back to the stockbroker 70 percent of his money and then he would be able to bring out the illegitimate cash and spend it openly without fear of any investigation."

Although the Court described Wenig's answer to the Government's questions concerning "legitimizing money" and "manipulation" as a "hypothetical statement" and "not evidence," the jury could only have obtained the impression that it was directed solely at Lewis and that Wenig knew that his assumptions were actual facts. The answer was as damning to Lewis as any *Bruton* [25] confession might have been—an impression that no instruction or charge could eliminate. The jury thus were told without any supporting proof that Lewis had "large sums of illicit money or illegally gotten money * * * accumulated through a series of bribes * * * [and was] afraid that the Internal Revenue Service may audit him some day * * * [and that he used] a device or mechanism or a scheme whereby he makes [made] this money appear legitimately [sic] * * * ". There was no proof of "illegally gotten money" or of a "series of bribes" despite the Government's opening statement that it would prove that Lewis had been taking bribes.

The rest of the answer was even more pointedly directed at Lewis and was equally without factual foundation. Wenig was saying that a "gentleman" (Lewis) who didn't want to show "bribe money" might "work with a stockbroker and have the stockbroker give him new issues of stock which would be bound to make money" and from this profit this gentleman would "give back to the stockbroker 70 per cent of his money" [the very percentage the Government claims here] and be able to spend the "illegitimate cash" without fear of investigation. Wenig also accused Lewis of "manipulating new issues" but his understanding of the term "manipulating" was that giving 70 per cent of the profits to a broker was "manipulating" and that this gave "a false appearance."

Wenig's answer as to his conception of "manipulation" is so patently erroneous as to need no other refutation.

"What I'm talking about the manipulation is when this stock is sold that he's giving 70 per cent of the profits to this particular broker and he is, therefore, manipulating with this stock be-

25. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

cause if you look up the definition of manipulation this is what it is, it is the act of performing in such an efficient manner the purpose to give a false appearance, the false appearance is that he was making all the money. He wasn't making all the money. This is what I am trying to get at, what I mean by stock manipulation."

With respect to the stock speculation, it was the Government's theory that Lewis and his regular 1961 broker (an Abbott Glasser then of Bruns, Nordeman & Co.) had an arrangement whereby Glasser allowed Lewis to purchase a portion of certain new issues which were allegedly guaranteed to rise in value. When these new issues turned over a quick profit to Lewis, he would give ("kick back") 70% of his profits to Glasser, thereby enabling Lewis to account for unspecified bribes allegedly received from taxpayers.

Abbott Glasser, a former registered broker presently in the hair weaving business, took the stand under a grant of immunity from prosecution for income tax evasion. He testified that Lewis in 1961 had given him a substantial portion of his profits on three stock transactions, some $5,500 out of $8,000 profits in the aggregate. Glasser in turn "kicked back" all or part of Lewis' "kickbacks" to him to the underwriters of the three respective issues. Two brokers associated with the underwriters named (Stanley Hilton of Robert Martin Associates and George Searight of Searight, Ahalt & O'Connor) took the stand to corroborate Glasser's story with respect to the kickbacks. Searight on cross-examination testified that it was not a violation of NASD rules for a broker to get "kickbacks" from his customer and that he did not know whether it was improper for a broker to get a "kickback" from his customer's profits in return for selling him securities. The Government never introduced any proof to rebut Searight's understanding of the law. The prosecutor did, however, attempt to infer impropriety by eliciting testimony from Glasser, Searight and Hilton that they

had never participated in any kickback arrangement other than the Lewis transactions.

The only purposes which the introduction of these stock transactions could have served in the minds of the jury was that there was something highly illegal in them which Lewis sought to conceal by bribing Wenig or as indicating circumstantially that Lewis had taken bribes in the past. However, there was no claim that there was any law which prohibited Lewis from sharing profits with brokers and no proof that Lewis did not pay the full income tax due on any such profits. In fact, the contrary was established and the Government does not claim otherwise. It is not disputed that Lewis properly reported all his stock transactions and his profits on his 1961 tax returns and paid the tax thereon. Nor was there proof that Lewis had taken bribes in the past.

On summation, the prosecutor further capitalized on his "kickback" theory by pointing to the immunity granted to the brokers, thus making it appear that the giving and receiving of a share in Lewis' profits was a crime. Lewis' "$30,000 to $40,000 trading in his own account" was stressed. The prosecution sought to find a motive for the payment in order "to hide those kickbacks."

The prejudicial nature of the introduction and characterization of Lewis' stock market activities is further emphasized by the Government's argument upon appeal that "[f]urther evidence that Lewis was predisposed to commit the crime charged is found in the kickbacks that he made to stockbrokers of his profits on the sale of new issues of stock." Although evidence of prior crimes under circumstances may be admissible, here not only was there no showing that profit-sharing with a broker was a violation of law or IRS rules and regulations (despite Wenig's gratuitous and unfounded suggestion to the contrary) but no proof was even offered that such a practice by a stockbroker was prohibited by any stock exchange, NASD or firm rule or custom.

The importance of this proof as influencing the jury's verdict is stressed by the Government's own statement that "[t]he jury obviously credited the brokers' testimony as to these payoffs [a term, like "kickback," sounding on wrongdoing] and disbelieved Lewis' denials."

### Recommending an Accountant

Wenig told Lewis that he had information that Lewis had recommended an accountant, which Wenig told the jury was "a violation of the Internal Revenue Service rules and regulations." There was no proof adduced at trial that Lewis' admitted recommendation of an accountant in a non-IRS-connected case violated any IRS rule or regulation.

### The Use of a Different Name

The Government (through Wenig), to further prejudice him in the minds of the jury, was permitted to introduce testimony that Lewis had told Wenig of a week-end trip to the Catskills (several years ago according to Lewis) with a religious group on which occasion Lewis did not give his right name. How this testimony bore any relationship to a predisposition to commit the crime of bribing a Revenue Agent in 1967 to deviate from his duty is beyond comprehension. The incident could only have been introduced to besmirch Lewis and was so used by the prosecution in summation. It was not only remote in time but completely irrelevant to the crime charged.

Finally, not content with these character-besmirching innuendoes, the prosecutor over defense objection told the jury on summation (assertedly by way of "an analogy") of former New York City Water Commissioner Marcus, a man supposedly of good character, who recently had been convicted of bribery in a case much featured in the public press.

### Conclusion

This court's comment in United States v. Tomaiolo,[26] is pertinent:

"In summary, by receiving this mass of inadmissible, irrelevant and highly prejudicial testimony, the District Court permitted the prosecution to paint the defendant Tomaiolo as a bad man, associated with criminal companions, who would do most anything. The accumulation of these errors made it impossible for the jury to limit its consideration to the charges for which Tomaiolo was being tried, and in sum, they constitute reversible error."

Appellant's other points need not be passed upon at this time. We are mindful of the force of a jury verdict but are convinced that the verdict could well have been based upon such prejudicial and inadmissible proof as would warrant the conclusion that Lewis was deprived of a fair trial.

The Government's use of the stock transactions, its characterization of Lewis' profit-sharing as "kickbacks," the implied illegal nature thereof by pointing to the testimony of the brokers under a grant of immunity, Wenig's testimony as to his interpretation of "legitimizing" and "manipulation," all combined must have had an effect on the jury which diverted it from the charges for which Lewis was being tried.

Reversed and remanded for a new trial.

26. 249 F.2d 683, 690 (2d Cir. 1957).