**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Norman N. WOLFSON,
Defendant-Appellant.**

**No. 76–3089.**

United States Court of Appeals,
Fifth Circuit.

May 18, 1978.

Daniel S. Pearson, Miami, Fla., for defendant-appellant.

Jack V. Eskenazi, U. S. Atty., Marsha L. Lyons, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before BROWN, Chief Judge, RONEY and FAY, Circuit Judges.

JOHN R. BROWN, Chief Judge:

This is a tax case on the problems involved in valuing yachts for charitable deductions. It is not a run-of-the-mill tax claim challenging a taxpayer's deduction on a return. The Government in this case went after a marine surveyor, Norman N. Wolfson, who allegedly overstated the value of seventeen yachts donated to two Florida universities. According to the Government, "[t]he indictment in this case was the first prosecution of its kind."[1] As a result of Wolfson's high appraisals furnished the donors, the Government claimed he was criminally liable for aiding in the preparation of fraudulent tax returns. 26 U.S.C.A. § 7206(2).[2] A jury found Wolfson guilty, but we reverse and remand for a new trial because of two significant trial court errors.

### Yachting For Charity

Norman Wolfson was in charge of yacht donation programs at Florida Institute of Technology from 1968 to 1975, and at Florida Atlantic University from 1970 to 1972. During most of this time, Wolfson also had the responsibility for selling the donated yachts when the universities did not keep the vessels. His compensation was derived from commissions on the proceeds from these sales.

Wolfson would send a standard letter to potential contributors reminding them that the value of their donation would be tax deductible. He also personally discussed with some of the taxpayers the deductibility of their donations. Each person who eventually gave a yacht to a university received an appraisal from Wolfson placing a fair market value on the vessel. His appraisal was generally accompanied by a letter purporting to be from Joe Le Blanc, an independent surveyor, which would confirm Wolfson's valuation. During trial, Le Blanc testified he was a friend of Wolfson and admitted discussing yacht prices with him. Le Blanc denied, however, authorizing anyone to sign his name to letters.[3]

Wolfson was indicted on nineteen counts of aiding in the preparation of fraudulent tax returns, and he was eventually convicted on seventeen.[4] Each count listed a taxpayer who had donated a boat to Florida Institute of Technology or Florida Atlantic University and had taken a charitable deduction based on the amount of Wolfson's appraisal. However, none of the taxpayers in this case, nor any of their tax lawyers or accountants, nor any official from the two universities, were indicted either separately or along with Wolfson. On four of the counts, moreover, the Internal Revenue

---

1. Motion to Extend the Time for Filing Appellee's Brief at 2.

2. The statute provides in pertinent part:

   Any person who—

   .      .      .      .      .

   (2) Aid or assistance.—Willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document;

   .      .      .      .      .

   shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $5,000, or imprisoned not more than 3 years, or both, together with the costs of prosecution.

3. Wolfson's secretary testified that she signed the Le Blanc letters. She explained, however, that she sent copies to Le Blanc, and he acknowledged some of them. Also, Le Blanc never told her to stop signing his name. R., vol. 5, at 990.

4. The Government dismissed one count, and the jury found Wolfson not guilty on another.

Service (IRS) allowed the full amount of Wolfson's appraised value as a charitable deduction to the taxpayer-donors.

To prove that Wolfson's appraisals were deliberately overstated, the Government employed primarily three techniques. First, it introduced evidence of the prices at which universities sold the donated yachts. Wolfson was in charge of selling thirteen of the nineteen boats and participated in making an appraisal on a fourteenth boat in connection with its sale. The sales prices were substantially less than the values Wolfson had attributed to each yacht. Second, the Government introduced evidence of the insurance taken out by the donee on each vessel. After the boats were donated, Wolfson, on behalf of the donees, procured limited marine insurance in amounts less than his appraisals.

Finally, the prosecution called expert witnesses. Horace Schmahl, another marine surveyor, reviewed Wolfson's reports on five yachts. Schmahl explained that he made his valuations using several sources, including surveys filed on similar and identical boats and the "BUC" book, which is a kind of "blue book" for the marine industry that makes adjustments for regional differences. Marine surveyor Elmer Strauss also testified for the Government. He evaluated all except three of the boats, using a method similar to that described by Schmahl. The value estimates of both experts were less than Wolfson's estimates.[5]

We believe, nevertheless, that the trial court committed serious errors relating to the evidence on sales prices and the amount of insurance on each yacht—the first two methods of proving that Wolfson knowingly exaggerated his appraisals.

*Instructing On Sales*

Wolfson insists that evidence of the prices at which the universities sold the vessels should have been excluded entirely. He argues that sales by the universities had no relation to fair market value. At best, their probative value was outweighed by the danger of unfair prejudice. The donee-universities, it is contended, had to sell boats as quickly as possible for economic reasons. All were sold within six months after donation and most within two to three months. In fact, an IRS Appellate Division audit report on one of the taxpayers who donated a yacht through Wolfson stated:

> The arguments for recognizing a fair market value in excess of the actual sales price are—
>
> 1. Universities generally have no need for the donated yacht and are anxious to sell at an early date in order to eliminate or minimize dockage, insurance, and maintenance charges.
>
> 2. The prompt disposition of donated yachts by the universities in effect is securing purchasers at forced sales prices.

Dx 27 at 4. Consequently, the IRS in that case refused to use the sale price for the amount of the charitable deduction.

As indicated in the IRS report, the universities did not have extensive marina facilities that would have allowed them to keep a large fleet of yachts. And maintenance costs on these vessels were extremely high. Upkeep on one of these boats, for example, ran as high as $25,000 a year.[6] In a similar case, the Tax Court held that the sale of donated personal property by a charitable organization was not indicative of value when the organization was under pressure to vacate its premises. *Estate of Alexia DuPont Ortiz DeBie*, 1971, 56 T.C.

---

5. Wolfson also had an expert witness, Joseph Fronapfel, testify in his favor. Although his estimates were somewhat lower than Wolfson's, in general they were close. The principal difference between Fronapfel's method of valuation and the Government experts approach was in the use of the BUC book valuation system. The BUC book gives a base value for each type of craft and then provides region-

al price adjustments. Fronapfel testified that instead of providing for a regional adjustment for Florida, as the Government experts did, he used a national "average" adjustment figure since the boats could have been donated in other areas of the country.

6. R., vol. 2, at 220 (BAR SHY). See also Dx 27 at 2 ($15,000 per year for DO–RE–MI).

876, 894–95. *See Daniel S. McGuire,* 1965, 44 T.C. 801. More than that, in this highly organized campaign to get large donations for the universities, it was never contemplated that the universities would ever use all the vessels. The whole idea was to sell the yachts the universities did not want as quickly as possible, the expectation being that sales could be made because of the unusually attractive prices acceptable to the donees who did not need or really want the yachts for their use. To cap it off, most sales figures were well below the values estimated by the Government's own experts.

■ We do not go so far, however, as to say that the sales figures should have been completely excluded. Although the defendant's argument has considerable merit, we believe the figures had some, albeit attenuated, relevance to market value[7] and to Wolfson's intent. But the limited usefulness of these sales prices highlights an overriding trial court error. For this evidence to go before the jury, the judge should have been scrupulous in his instructions on the relationship between the sales and fair market value. Indeed, "the closeness of the issue . . . imposed an obligation on the trial court judge to instruct the jury with extreme precision . . . ." *Cooper v. United States,* 1966, 123 U.S.App.D.C. 83, 85, 357 F.2d 274, 276 (Bazelon, C. J., separate opinion), *quoting, United States v. Garguilo,* 2 Cir., 1962, 310 F.2d 249, 254.

The Judge's instructions in this case on how the jury should consider evidence of sales were as follows:

In determining the weight to be given the actual cost or sales price, as a measure of fair market value, the jury should consider the closeness of the sale or purchase to the date of donation, the type of sale, and whether the transaction was at arm's length. *A forced or distress sale should be accorded less weight in your consideration.* Similarly a sealed bid auction, where there is no room to negotiate may be accorded different weight than a negotiated sale. The terms of sale and market conditions may also be weighed.

A bona fide offer to purchase the donated property, made in close proximity to the date of donation, may also be considered in your determination of fair market value, provided the prospective purchaser was willing to complete the transaction and was financially or otherwise able to carry it out.

A sale of comparable property occurring near the donation date may be considered by the jury as evidence of the fair market value, giving consideration to the proximity of sale, similarity between the properties, *type of transaction, and circumstances of the markets involved.*

R., vol. 6, at 1397–98 (emphasis added).

■ Although it is not entirely clear, apparently, the only direct reference to Wolfson's theory that the university sales were not good indicators of market value was the sentence: "A forced or distress sale should be accorded less weight in your consideration." In light of the extensive evidence that these sales had little bearing on market value, we do not believe that this single sentence, using the legal jargon of "forced or distress,"[8] set in the midst of largely irrelevant instructions, was sufficient. No one argued, for instance, over the merits of a "sealed bid auction," yet instructions on that topic were as prominent as those on "forced or distress" sales. The Judge failed to meet his obligation for providing precise instructions on the factual issues in controversy. As we have stated again and again:

---

7. *Cf. United States v. Certain Land in City of Fort Worth, Texas,* 5 Cir., 1969, 414 F.2d 1029, 1031–32 (in condemnation case, economic pressure to sell went to weight of evidence, not admissibility).

8. According to a legal dictionary, a forced sale is "a sale made under the process of the court. . . ." Black's Law Dictionary 774 (rev. 4th ed. 1968). A distress sale occurs pursuant to the "taking of a personal chattel out of the possession of a wrong-doer into the custody of the party injured, to procure satisfaction for a wrong committed; as for non-payment of rent. . . ." *Id.* at 561. Neither definition fits the facts of the yacht sales by the universities.

The primary purpose of jury instructions is to define with substantial particularity the factual issues, and clearly to instruct the jurors as to the principles of law which they are to apply in deciding the factual issues involved in the case before them. *United States v. Hill,* 417 F.2d 279 (5th Cir. 1969). Accordingly, a defendant is entitled to a charge which precisely and specifically, rather than merely generally or abstractly, points to the theory of his defense. *Perez v. United States,* 297 F.2d 12 (5th Cir. 1961). *United States v. Gilbreath,* 5 Cir., 1971, 452 F.2d 992, 994; *see also Knapp v. United States,* 5 Cir., 1963, 316 F.2d 794.

■ The Government contends that the meaning of "forced or distress" sales was clear to the jury, especially since the defendant's counsel used these words in his closing argument. But Wolfson's counsel used such language in his closing only because the trial court had already announced its intention to use it in the charge. In any event, we look to the words of the trial court, not defense counsel, in determining if jury instructions are adequate. The burden of giving proper instructions is on the Judge. F.R.Crim.P. 30. And it is his words, not the lawyers, which "carry an authority bordering on the irrefutable." *Moody v. United States,* 5 Cir., 1967, 377 F.2d 175, 179. The terms "forced or distress" were not commonly used by witnesses during the trial to describe the circumstances of the university sales. When the evidence does not clearly relate to the instructions, we cannot depend on defense counsel's closing argument to save the Judge from error.

■ Neither can we say with "fair assurance" that the misleading instructions were harmless. *Kotteakos v. United States,* 1946, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557, 1566–67. The evidence on sales was an integral part of the Government's overall plan for proving that Wolfson's appraisals were knowingly exaggerated. Indeed, in the Government's summary exhibit chart, listing Wolfson's appraisals, the sales figures, the amounts of insurance and the estimates of the Government experts, the sales figures were placed, no doubt deliberately, next to Wolfson's appraisals, emphasizing the extreme differences.

In this case, therefore, the trial court's charge simply did not measure up to the minimum standard for jury instructions on a close question. Failure to give better instructions in view of defendant's objection and request for a different charge was reversible error.[9]

*Crossing On Insurance*

We also find reversible error in Wolfson's contention that the trial court unduly limited cross examination of Government witness Thomas F. Diack, a marine insurance agent. Wolfson had procured the insurance on the yachts through Diack after they were donated to the universities. The amount of insurance on each boat was much lower than the value at which Wolfson had appraised the vessels. The prosecution called Diack and had him only identify the insurance documents, and verify that he had received the request for the amount of insurance on each boat from Wolfson. Obviously, the Government wanted the jury to believe that the insurance figures repre-

---

9. Although on remand we do not mandate any particular instruction, we believe the charge Wolfson proposed highlighted his specific objection and constituted the proper approach on the minimum requirements for a specific instruction on the facts peculiar to the case, except as to the bracketed words:

> Value is a question of fact to be resolved upon a consideration of all the evidence. If you find as a fact that the boats involved herein were quickly resold by universities and charitable foundations for reasons of

> their own, such as a need for funds, or lack of funds to properly maintain the boats you may conclude that such subsequent sales are not at arm's length and [are not indicative of value.]

The trial court rejected this instruction because the jury could conclude that the sales "are not indicative of value." R., vol. 6, at 1304–05. Since the evidence is just barely relevant, this problem could be remedied by substituting the phrase "should be accorded slight weight."

sented what Wolfson thought were the actual market values for each yacht.

Wolfson's attorney then tried to cross examine. After some perfunctory questions, he asked: "Did you have discussions with Mr. Wolfson about the amounts that are placed on that exhibit under the amount value?" The Judge sustained a Government objection that this question was beyond the scope of direct. Although counsel vigorously protested,[10] the trial court insisted that "technically" the objection was sound, and therefore, this line of questioning was forbidden.

Counsel then was forced to take Diack as his own witness.[11] He managed to elicit that Diack believed on the average the insurance figures were ten to fifteen percent below fair market value. Again, however, even during this limited exchange, the Court prevented counsel from asking Diack about his familiarity with the marine industry because it was beyond the scope of direct.

10. Wolfson's attorney made the following statement to the Court:

> The man has got values on those exhibits, dollar values. Those dollar values supposedly indicate the value of the boats. I have a right to fair cross to determine how those were determined and whether or not he argued those were inadequate values. He did argue. I am not asking the question in the blind. And that's absolutely proper cross within the scope of this examination.
>
> The document was put in. If all you can do is put in a document and give the implication that everything it says is perfect and I can't cross examine the man who made the document because it's outside the scope of the direct, that's just an unfair presentation of evidence.
>
> Your Honor, the man just said what the thing was and what the amounts were and where he got them from. Now, certainly counsel is entitled to ask him what that column "Insured value" means. It doesn't say fair market value. We don't say it was fair market value. But it is absolutely fair cross as to how it is determined and whether he disagreed with it. I mean these are his documents. We are not trying the case on innuendo.

R., vol. 4, at 865–66.

11. The entire exchange between Wolfson's counsel and Diack while he was the defendant's witness was as follows:

After closing, counsel explained to the Court that he was not abandoning his objection to the restriction on cross examination. He asked if he could make a proffer to the Court on what he considered to be within the proper scope of cross. The Court responded that it would be unnecessary since Wolfson's counsel had told Diack he was subject to recall, but added: "You may do so out of my presence. I don't need to be here for that." R., vol. 4, at 870. The Judge walked out, and counsel made the following proffer for the record:

> I was intending to ask Mr. Diack whether or not the insurance values that were set by Mr. Wolfson were subject to great debates between he and Mr. Wolfson; when Mr. Wolfson refused to increase them by 100 percent, whether or not Mr. Wolfson explained to him that the universities who were funding this program did not have the money to pay for insurance; whether or not the insurance was limited to full insurance, be-

Q Mr. Diack, the figures in the column that says insured value, do they indicate what the fair market value of the boat is?
A I would say they'd be low of the fair market value.
Q Did you explain that to the Government?
A Yes, I did.
Q And how low would you say they'd be?
A I'd say on the average ten to fifteen percent below the fair market value.
Q Did you discuss that with Mr. Wolfson?
A Yes, I did.
Q Did you tell Mr. Wolfson that they were 50 to 100 percent below fair market value in some instances?
A I could have told him that in some instances, yes.
Q And without having seen the vessel or read a survey recently you can't comment on it, can you?
A Not well.
Q And, Mr. Diack aside from being in the insurance business are you quite familiar with the marine industry?
MRS. LYONS [Government's counsel]: Outside the scope of direct, Your Honor. Objection.
THE COURT: Sustained.
MR. BIERMAN [Wolfson's counsel]: At this point, Mr. Diack I have no further questions.
R., vol. 4, at 867–68.

cause again the universities did not have the money to pay for the full insurance.

I intended to ask Mr. Diack whether he had extended arguments with Mr. Wolfson over the value of the boats; whether he insisted to him that the boats were severely underinsured; whether in response to those arguments on each occasion Mr. Wolfson would explain to him that the universities were unwilling to ·spend the necessary money to operate or maintain the boats or insure the boats.

I intended to ask him whether or not he had explained this entire situation to the Government in detail.

R., vol. 4, at 870–71.

▮▮▮▮ We realize that F.R.Evid. 611(b), despite criticism of leading commentators,[12] restricts cross examination in general to the subject matter of the direct.[13] We believe, however, that the proffered questions were well within that limit. The scope of the direct is measured by the "subject matter of the direct examination rather than by specific exhibits which are introduced at that time." *United States v. Segal*, 3 Cir., 1976, 534 F.2d 578, 582. In the instant case, the subject was insurance on the yachts with the obvious implication that the insurance figures represented what Wolfson believed was the fair market value of the vessels. Diack had intimate knowledge of how the dollar values for the insurance were determined. He was not just a file clerk. He was the president of the insurance agency. Diack had negotiated with Wolfson on how much insurance to procure. But Diack was never "exposed to the truth-revealing pressures of the sort of cross examination which is really the heart of our adversary system." *Beaudine v. United States*, 5 Cir., 1966, 368 F.2d 417, 424.

We cannot condone, therefore, the trial court's approval of the Government's game of introducing into evidence insurance figures to support its basic thesis that insured values demonstrated overstated market values and then pleading that questions about those figures were beyond the scope of direct. "[I]n a close case the rule must not be so strictly applied as to deprive the defense of an opportunity to present to the jury a vital element of the defense . . . ." *United States v. Lewis*, 2 Cir., 1971, 447 F.2d 134, 139. At best, the trial court's restrictions were a reversible abuse of discretion. *United States v. Crumley*, 5 Cir., 1978, 565 F.2d 945, 949. At worst, they denied Wolfson his Sixth Amendment right to confrontation. *United States v. Mayer*, 5 Cir., 1977, 556 F.2d 245, 250; *United States v. Greenberg*, 5 Cir., 1970, 423 F.2d 1106, 1108.

The Government argues that the restrictions, at most, were merely harmless errors because some background on the insurance was presented to the jury when Wolfson's attorney was forced to take Diack as his own witness. See *United States v. Onori*, 5 Cir., 1976, 535 F.2d 938, 945–46. However, we do not believe the substance of the desired information got before the jury, as it did in *Onori*. Wolfson's counsel did not explore the circumstances surrounding the submission of the insurance figures to Diack. The basic unanswered question was ·still whether the insurance had any relation to market value. For instance, Diack admitted that the amounts of insurance were ten to fifteen percent lower than fair market value, but on what basis could he make that statement? Did Wolfson tell him that? Was Diack an expert in marine appraisal? Moreover, a credibility question exists. Certainly, as an insurance agent, Diack had a monetary interest in urging a high amount of insurance on each vessel. If Wolfson failed to follow his recommenda-

---

**12.** *See, e. g.*, 6 J. Wigmore, Evidence §§ 1887–88 (J. Chadbourn rev. ed. 1976); McCormick on Evidence § 27 (2d ed. E. Cleary ed. 1972).

**13.** The rule provides:

(b) *Scope of cross-examination.* Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.

tions, then Diack might be prejudiced against him.[14]

We, therefore, determine that it was an abuse of the trial court's discretion to restrict cross examination here since Wolfson's proffer was within the scope of direct and F.R.Evid. 611(b) specifically allows cross on the subject matter of direct. Cross examination on this issue was a right, not simply a question of the order of proof. *See United States v. Segal*, 3 Cir., 1976, 534 F.2d 578, 582–83. As the Second Circuit has emphasized:

> The chief, if not sole, virtue advanced on behalf of the restrictive "Federal rule" is that it ensures that the customary order for the introduction of proof is preserved by preventing the cross-examiner from eliciting evidence for its affirmative case. Surely that rationale, laboring under long-levied criticism by eminent authorities, is thoroughly subverted where it is applied even though the prosecution on direct is permitted to open the door to a matter bearing directly upon the defense's case in chief.

*United States v. Lewis*, 2 Cir., 1971, 447 F.2d 134, 140 (footnote omitted). Accordingly, on remand, Wolfson's attorney should be allowed fully to cross examine Diack.

### Wrapping Up

■ Wolfson also contends that the trial court erroneously restricted the introduction of evidence during testimony of Henry Doll, a yacht broker who ran a donation program for Nova University. Doll testified that Nova was under pressure to sell donated yachts, and often they were sold well below the price at which the vessels were appraised. This testimony was admitted to rebut the Government's sales figures in Wolfson's case and to show that boat donation programs operated by persons oth-

er than the defendant shared the same characteristics. In particular, Wolfson tried to introduce eight exhibits on sales of donated yachts by Nova University. Four of these exhibits, however, were excluded by the trial court as being irrelevant because the time between the appraisal and the sale by the donee was greater than six months. Wolfson claims that the six-month cut-off was a denial of his right to present a defense.

Although we do not find that the six-month limitation rises to the level of reversible error, nonetheless, we believe that on remand the trial court should admit the sales evidence. No sale was more than nine months after the appraisal date. In the context of this case, a six-month cut-off borders on being arbitrary. *Cf. United States v. 633.07 Acres of Land*, M.D.Pa., 1973, 362 F.Supp. 451, 453 (in condemnation case, remoteness of sale went to weight of evidence, not admissibility; evidence of nine-year-old sale admitted to prove market value).

■ Wolfson also challenges the trial court's decision to change one of the defendant's charts that displayed the percentage variance between the sales figures on the yachts and the estimates of value by the government experts. We believe, however, that the alterations forced by the trial court were within its responsibility to clarify issues and eliminate confusion. *See, e. g., United States v. Uptain*, 5 Cir., 1976, 531 F.2d 1281, 1291. In any event, Wolfson primarily complains of the manner in which the changes were made. The defendant's witness had to make the alterations on the chart in front of the jury. Since Wolfson is now forewarned, the same problem is unlikely to recur on remand.

■ The probable recurrence of one other issue compels us to consider it briefly. The indictment alleged a violation under 26

---

14. The Government's own expert witness Horace Schmahl also explained why insured values may not reflect the market value of a vessel:

> [I]nsureds hoping for no particular disaster, but hoping that there will never be a total, underinsure their vessels or try to underinsure their vessels . . . at a lower premium payment [to] get the benefit of repairs.

> Now, when the vessel is lost and there is a total and the insured comes out screaming and says "Well, the vessel is actually worth $100,000 although I have only insured it for $60,000," the underwriters cold-bloodedly reduce the recovery by 40 percent and say "Friend, you are co-insured."

> R., vol. 4, at 255.

U.S.C.A. § 7206(2) only with respect to the preparation of fraudulent tax returns. Wolfson contends that his conduct could not fall under this statute because he did not prepare returns *per se.* At best, he provided only an appraisal that the taxpayer or his accountant used to prepare a return.

We hold, however, it is possible for Wolfson to be prosecuted under this statute. In *United States v. Crum,* 9 Cir., 1975, 529 F.2d 1380, the defendant did not prepare tax returns. Rather, he bred and sold beavers and provided backdated beaver purchase contracts used by taxpayers for fraudulent depreciation deductions. The returns were prepared by an attorney and an accountant who were part of the scheme. The Ninth Circuit held that § 7206(2) was not limited to tax return "preparers," and Crum's conviction was affirmed. *See also United States v. McCrane,* 3 Cir., 1975, 527 F.2d 906, 913, *vacated and remanded on other grounds,* 1976, 427 U.S. 909, 96 S.Ct. 3197, 49 L.Ed.2d 1202. Thus, Wolfson does not have to sign or prepare the return to be amenable to prosecution. If it is proved on remand that he knowingly gave a false appraisal with the expectation it would be used by the donor in taking a charitable deduction on a tax return, it would constitute a crime.

REVERSED and REMANDED.